## Worth CAMP, Jr. *v.* FIRST FINANCIAL FEDERAL SAVINGS AND LOAN ASSOCIATION

89-30                                                      772 S.W.2d 602

Supreme Court of Arkansas

Opinion delivered July 10, 1989

[Rehearing denied September 25, 1989.*]

*Gill Law Firm*, by: *John P. Gill*, for appellant.

*Law Offices of Ian W. Vickery*, by: *Ian W. Vickery,* for appellee.

ROBERT H. DUDLEY, Justice. Appellant, Worth Camp, Jr., co-signed a $25,000 promissory note payable to appellee, First Financial Federal Savings and Loan Association. The purpose of the transaction was to establish a line of credit for an inventory of used cars to be resold by Rusty Jones, a used car dealer who was the other co-signer. The note was renewed three (3) times and, during that time, the amount of the note was increased to $50,000. Jones defaulted, suit was filed, and judgment was entered against Jones and appellant, jointly and severally, in the amount of $52,180, plus interest at the rate of 12% and attorneys'

---

*Hays and Glaze, JJ., would grant rehearing. Hickman, J., not participating.

fees of $5,218. Jones is not involved in this appeal. We reverse the judgment against appellant.

The facts concerning the execution of the note are not in dispute. Jones applied to appellee for a loan in order to open a used car business. Appellee refused to make a loan to Jones. Jones, a family friend of appellant Camp, asked appellant if he would co-sign a note. Appellant agreed, and the two of them then completed a credit application for appellee. Appellee agreed to make a $25,000 loan if both co-signed the note. The loan was approved because of appellant's financial worth. Appellant neither owned nor acquired an interest in the used car business, nor did he receive any of the proceeds of the loan. Appellant, an attorney, did represent Jones in the formation of his business and charged Jones a reasonable fee for his work.

Ark. Code Ann. § 4-3-415(1) (1987) defines an accommodation party as "one who signs the instrument in any capacity for the purpose of lending his name to another party to it." The comment to this section provides in part that the "essential characteristic is that the accommodation party is a surety, and not that he has signed gratuitously." Thus, an accommodation party may appear on the instrument as a co-maker. *See* J. White and R. Summers, *Uniform Commercial Code,* § 13-12, at 516 (2d ed. 1980). Under the facts of this case, appellant is an accommodation party and a surety.

Sureties may have simple contract defenses. *See* Comment to Ark. Code Ann. § 4-3-415(1) (1987). One of the defenses involves the creditor's failure to disclose facts which materially increase a surety's risk. A number of courts have adopted Section 124(1) of the Restatement of Security (1940), to define the creditor's duty to disclose. *Sumitomo Bank of California* v. *Iwasaki,* 70 Cal. 2d 81, 88, 73 Cal Rptr. 564, 571, 447 P.2d 956, 963 (1968); *accord, Maine National Bank* v. *Fontaine,* 456 A.2d 1273 (Me. 1983); *First National Bank of Arizona* v. *Bennett Venture, Ltd.,* 130 Ariz. 562, 564, 637 P.2d 1065, 1067 (App. 1981); *First National Bank & Trust of Racine* v. *Notte,* 97 Wis. 2d 207, 213, 293 N.W.2d 530, 536 (1980); *Watkins Products, Inc.* v. *Stadel,* 214 N.W.2d 368 (N.D. 1973). We also adopt the section which provides:

§ 124. Non-Disclosure by Creditor.

(1) Where before the surety has undertaken his obligation the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor also has reason to believe that these facts are unknown to the surety and has reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts is a defense to the surety.

Comment (b) to that section states that:

Among facts that are material are the financial condition of the principal, secret agreements between the parties, or the relations of third parties to the principal. If the surety requests information, the creditor must disclose it. Where he realizes that the surety is acting or is about to act in reliance upon a mistaken belief about the principal in respect of a matter material to the surety's risk, he should afford the surety the benefit of his information if he has an opportunity to do so.

In this case, the original note was executed on August 2, 1984, and the renewals were executed on January 25, 1985, September 11, 1985, and March 15, 1986. The appellant testified that on August 15, 1985, just before the September 1985 renewal, the loan officer of appellee "advised me the note was coming up for renewal and he advised me that the interest had been paid." Appellee offered no evidence to the contrary. In truth, interest payments were four (4) months delinquent. Appellant testified that he would not have executed the September 11, 1985, renewal if he had known that interest was not current. The trial court did not find that these facts constituted a sufficient defense, but that appears to be because that court, faced with a case of first impression, applied the wrong standard of duty. It held that "the evidence shows that the plaintiff [appellee] did not administer this loan in bad faith or cause any fraudulent misrepresentations with regard thereto to be made, and that the actions of the bank in administering this loan did not impair the collateral in question." It was not necessary for the surety to prove bad faith or fraudulent misrepresentation. Instead, he had to prove only the elements set forth in Section 124.

Appellee's conduct toward appellant was even more egre-

gious in a different regard. All of the witnesses agreed that appellee would not make the loan to Jones alone. Appellee's president testified that "the loan would not have been made without Mr. Camp as the co-borrower." However, once appellant signed as a co-maker, and the loan limits were practically reached, the appellee began making side loans, or personal loans, to Jones. For example, when $24,861 of the guaranteed $25,000 line of credit had been reached, appellee made a side loan to Jones of $3,250. When $48,019 of the $50,000 guaranteed line of credit had been reached the appellee made side loans to Jones of almost $10,000. These side loans to Jones amounted to $25,038, and were repaid from cars which were mortgaged to appellee. Yet, all parties understood that the loans which appellant co-signed were to be repaid by sale of the car inventory. Appellant knew nothing of the side loans and naturally thought that Jones' used car business was making payments only on the loans which he co-signed. The trial court again applied the wrong standard and held that although appellee "did loan additional sums to the Defendant Jones without the knowledge of Mr. Camp, these loans evidenced by 'side notes' were not in violation of any duty to Mr. Camp nor do they fall within the concept of bad faith by the Plaintiff [appellee]."

Both of these actions, the failure to disclose and the secret side loans, materially increased the surety's contemplated risk, and the creditor was aware of the surety's ignorance of the facts. Yet, the creditor, appellee, chose to misrepresent the truth about the currency of the interest payments and to secret the side loans.

■ As a result of the actions, the surety assumed a risk well beyond that which he intended. The appellee was aware of the facts, and although given the opportunity, failed to communicate them to the surety. Such actions by a creditor discharge a surety. Accordingly, the judgment is reversed and the complaint is dismissed.

Reversed and dismissed.

HICKMAN, J., not participating.

HAYS, J., dissents.

STEELE HAYS, Justice, dissenting. I take no exception to the adoption by the majority of Section 124 of the Restatement of the

Law of Security requiring a creditor to disclose information to a surety which materially increases the risk assumed by the surety. However, in applying § 124 to this case, I believe the majority misconstrues both the facts and the law.

The majority asserts that appellant was told the interest payments were current when in fact they were four months in arrears. I concede the appellant testified to that, but that is the only evidence in the abstract (or, for that matter, the record) which attests to either the status of the interest payments or what appellant may have been told. The appellant argues that his testimony on these points is undisputed. But that contention ignores the settled rule that the testimony of a litigant is disputed as a matter of law, even though it may be unchallenged. *Knobles* v. *Salazar*, 298 Ark. 281, 766 S.W.2d 613 (1989); *Courtney* v. *Courtney*, 296 Ark. 91, 752 S.W.2d 40 (1988); *Hamby* v. *Hankins*, 275 Ark. 385, 630 S.W.2d 37 (1982); *Hurley Pickett Lake Farms, Inc.* v. *Sullivan*, 245 Ark. 709, 434 S.W.2d 88 (1968), and *Skillern* v. *Baker*, 82 Ark. 86 (1909). Moreover, the findings of the circuit judge were to the contrary and the majority fails to explain how those findings were clearly erroneous. Indeed, the majority treats the appellant's testimony as though he had prevailed in the trial court. The majority also ignores the testimony of Rusty Jones that several times each year and particularly when the note came up for renewal he and appellant sat down and discussed the current status of the business. Even if we were to accept the appellant's testimony as undisputed on this point, it would still not relieve him of liability for the indebtedness existing prior to the last renewal.

Citing a finding by the trial court that the bank did not act in bad faith or make any fraudulent misrepresentations in connection with the loan, the majority asserts that the trial court applied the wrong standard of duty to the bank. Clearly, the trial court was merely observing that in making side notes to Rusty Jones, the bank did not act fraudulently or in bad faith. Nothing suggests the trial court adopted an erroneous standard and it should be noted that the appellant does not even attempt to advance such an argument.

As to the side notes, again I can find nothing in the abstract or the record which supports the assertion that the side notes were

repaid from the sale of the inventory of used cars. The fact is, the side loans were handled entirely separately from the inventory and affected appellant's risk not at all. If anything, the side loans benefited the venture by keeping fresh stock on the lot.

Comment (b) to § 124 (quoted in the majority opinion), points out that "secret agreements" between the parties must be disclosed, but that comment is clearly subject to the language of § 124. That is, it is not just any secret agreement that must be disclosed by the creditor, but only those which "materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume." Moreover, under the interpretations of this section of the Restatement, the making of an additional loan to the borrower is not sufficient in itself to support a finding that the risk to the surety has been materially increased. In *Sumitomo Bank of California v. Iwasaki*, 70 Cal.2d 81, 73 Cal. Reptr. 564, 447 P.2d 956 (1968), cited by the majority, the court examined an agreement between the creditor and the borrower that was not disclosed to the surety. The agreement provided for a later, additional loan to the borrower for funds to pay federal taxes. In a thorough analysis of the disclosure requirements of § 124, the *Sumitomo* court listed three prerequisites for the imposition of a duty to disclose:

> (a) 'the creditor has reason to believe' that those facts materially increase the risk 'beyond that which the surety intends to assume'; (b) the creditor 'has reason to believe that the facts are unknown to the surety'; and (c) the creditor 'has a reasonable opportunity to communicate the facts to the surety.'

The court in *Sumitomo* did not reach the question whether the new loan increased the risk, because there was no evidence of the debtor's financial position at the time the surety was signed, so the bank had no information concerning the risk the surety intended to assume. The court stated:

> Thus, the evidence cannot support a finding that the [debtors'] inability to pay their taxes without a loan materially increased [the surety's] risk. *A fortiori*, it cannot support a finding that the [creditor] had reason to believe this fact materially increased [the surety's] risk.

The court also observed that a note for taxes would not ordinarily suggest to a creditor that a material increase in risk was created.

Section 124 was similarly interpreted in *Peoples National Bank of Washington* v. *Taylor*, 711 P.2d 1021 (Wash. App. 1985). There the surety was guaranteeing a loan for part of the price of a boat. The bank was expecting the buyer/debtor to produce the balance of the price through the sale of his home, which seemed imminent. The sale of the house did not go through and the bank then gave the debtor a "bridge loan," which was renewed four times in the following thirteen months. The debtor ultimately defaulted on the guaranteed loan and the surety, when sued on the guarantee, attempted to defend on the basis of § 124 and the bank's nondisclosure of the bridge loan. The court found no violation of § 124, finding that the bridge loan had been ultimately satisfied by the sale of the house, and that the loan otherwise presented no material increase in risk to the surety. The court pointed out that the surety had not demonstrated how, as a matter of law or fact, the bridge loan would have been significant to the surety or how the bank would have had reason to know about the alleged materiality.

Here, there is no evidence to support a conclusion that these side loans materially increased the risk undertaken by appellant. The loans were all made independently of the credit line signed by appellant, and each was collateralized by a specific vehicle purchased by Jones. The side loans were paid off as Jones was able to sell those specific vehicles, and all the side loans were in fact satisfied. Jones's problems were a result of his inability to sell the cars he purchased on the guaranteed credit line, and it was this venture that appellant had undertaken to insure. The side notes did not increase appellant's risk, as they were each individually collateralized. In fact, when asked directly if he had any knowledge of money generated by the sale of cars from the inventory being used to pay any of the side loans, appellant answered, "I have no specific knowledge of how the funds were applied. I just know some of these [side loans] were used car loans." The fact is under the arrangement for payment to the bank on both loans, such a procedure would not have been possible, as the bank released titles only upon payment from Jones. Were the purchaser of a car from the credit line of vehicles to have his payment credited to one of the side loans, Jones would not have been able to

obtain the title from the bank to deliver to the purchaser.

The thrust of appellant's argument is that the alleged interest and side note problems revealed to the bank that Jones's business was in trouble, and, had the bank disclosed that to appellant, he would not have signed the renewals. Yet prior to the last renewal appellant was specifically told the loan was in trouble and was "a problem loan," even so, he decided to sign the renewal. Given that, the trial court could easily conclude, as it did, that trouble in running the business and meeting the loan was a risk that appellant had assumed, and in that case, even if the bank had known of some trouble in Jones's business, it was not beyond the risk appellant had originally assumed. See *Sumitomo, supra:*

As is also stated in Comment (b) of § 124:

Every surety by the nature of his obligation undertakes risks which are the inevitable concomitants of the transactions involved. Circumstances of the transactions vary the risks which will be regarded as normal and contemplated by the surety. While no surety takes the risk of material concealment, what will be deemed material concealment in respect of one surety may not be regarded so in respect of another.

I submit that appellant has not shown that the risk he assumed was materially increased and the circuit judge so held. He should be affirmed.